JACOBS *v.* CITY NAT'L BANK OF FT. SMITH, ARK.

1518                                        313 S. W. 2d 789

Opinion delivered May 26, 1958.

[Rehearing denied June 23, 1958.]

*Hardin, Barton, Hardin & Garner,* for appellant.

*Harper, Harper & Young,* for appellee.

CARLETON HARRIS, Chief Justice. J. L. Jacobs operated an automobile motor company in Fort Smith under the name of Jacobs Motor Company. On September 24, 1955, Jacobs and wife, Mary Virginia, executed their promissory note to appellee in the sum of $3,000, due 90 days from date, and bearing interest at the rate of 6 per cent per annum until paid, representing borrowed money, which was deposited by Jacobs in

his bank account with appellee for use in his business. To secure the payment of said note, Jacobs and wife executed and delivered to the bank a second mortgage on certain real estate situated in Sebastian County.[1] At the same time they executed a chattel mortgage on various household items.[2] On December 27, 1955, Jacobs made a payment to the bank of $500 on the principal of said note, and paid the interest, leaving a principal balance due of $2,500, and on the same date, Jacobs and wife entered into a written extension agreement, which was attached to the note, extending the maturity date thereof to March 23, 1956. On January 31, 1956, Jacobs executed an additional promissory note to the bank for $6,000 for borrowed money, due on demand, for the purpose of obtaining money to use in his business.[3] On February 6, 1956, apparently using a portion of the money obtained by the execution of the note on January 31st, Jacobs paid to the bank the principal balance of $2,500, and interest due on the note executed September 24, 1955, and extended to March 23, 1956, and accordingly remained indebted to the City National Bank in the principal sum of $6,000. On April 21, 1956, Jacobs paid appellee $1,000 on the principal of said note together with interest, and executed a new note, due in 90 days, in the amount of $5,000, as a renewal thereon. Thereafter, the note was successively renewed without payment (except for interest) until October 18, 1956, when it was last renewed by the execution of a note by Jacobs to the bank in the sum of $5,000, due and payable 90 days from date, and bearing interest at the rate of 6 per cent per annum until paid. The mortgage of September 24, 1955, was not

---

[1] A first mortgage was held by F. W. Dyke, trustee for the United Savings Association, which was recognized by appellee as being superior and paramount to the bank's mortgage. The property was later conveyed by Jacobs and wife to one H. E. Jacobs, a party appellant in this case, but the effect of such conveyance is not emphasized by any of the litigants herein.

[2] The chattel mortgage was subsequently released by virtue of the payment of an agreed amount of money and is not now considered in this litigation.

[3] Prior to this date, Jacobs had executed other notes to the bank and obtained money therefor in the course of conducting his business, and had repaid such loans.

released when the balance due on the note of same date was paid the bank on February 6, 1956, and under the bank's contention, the mortgage was intended also to secure any future advances made to Jacobs. Suit was instituted against Jacobs and wife on April 15, 1957, for the sum of $5,000 (the amount due under the note of October 18, 1956) and sought to foreclose the mortgage, heretofore referred to, taken on the property in 1955. Jacobs counterclaimed for $6,000, alleging that the bank had illegally taken possession of certain of his motor vehicles, and wrongfully disposed of them at a price greatly under the actual value, and sought damages in the aforesaid amount. To explain the counterclaim, we relate the following facts. Jacobs would take a buying trip, and buy several cars. He would return to the bank, execute a chattel mortgage and note in blank, and discuss with the proper bank official the cars he had bought, giving them the necessary information about the automobiles, motor and serial numbers, etc. The bank would fill in the mortgage, listing the said cars by description, fill in the amount they would loan on the cars, and give this amount to Jacobs. Jacobs would sell to a prospective purchaser, and a conditional sales contract and note would be executed by the purchaser, and given to the bank after endorsement by Jacobs. He would then receive credit for the amount contained in the conditional sales contract, on the note which he had signed under the chattel mortgage, less $25 which went into a special account designated "Reserve Account."

Sometime in January or February of 1956, Jacobs was informed by his doctors that he had cancer, or cirrhosis of the liver, and on February 8th, he left for Mayo Brothers Clinic for examination. The next day, several bank officials went to Jacobs' used car lot, taking with them a letter which had been prepared and typed at the bank. The letter was directed to Edward Reed, president of the City National Bank, and advised the bank that Jacobs desired appellee to take over the cars and dispose of them in order to pay any indebtedness he might owe the bank. Jim Underwood, who had

been left in charge of the lot, signed the letter.[4] The bank thereafter proceeded to dispose of the vehicles which Jacobs had floor planned with them (for $14,-118.72), by selling them to one J. L. Swink for $9,625. Swink shortly resold them for $11,418. The "Red Book," used by car dealers and finance companies, gave the "as is" value of the vehicles as $13,495, with average retail value of $18,210.

On trial, the Chancellor held that the real estate mortgage dated September 24, 1955, did secure the $5,000 note dated October 18, 1956, and rendered judgment against Jacobs in the sum of $5,000, together with interest at the rate of 6 per cent per annum, $200 attorney's fee, found that the claim of H. E. Jacobs was inferior to the lien of appellee's mortgage, foreclosed any right, title, or interest of J. L. Jacobs and Mary Virginia Jacobs in the property, and ordered it sold. The counterclaim filed by Jacobs was dismissed. From such judgment of the court comes this appeal.

For reversal, appellant first asserts that the $5,000 note, dated October 18, 1956, was not secured by the real estate mortgage of September 24, 1955, and the court erred in holding otherwise. Next, it is contended that the bank became a trustee of the vehicles when it took possession of them, and did not comply with the provisions of the instruments, under which, it disposed of the automobiles. It is then urged that the bank, by repossessing some vehicles from the ultimate purchasers, waived the unpaid balance on them. We proceed to a discussion of each point.

In contending that the note in question was secured by the earlier mortgage, appellee relies upon the following provision in the mortgage (a printed provision and appearing in the defeasance clause):

"Now if the said mortgagors shall pay or cause said indebtedness to be paid with interest according to the terms hereof *and all other indebtedness of the mort-*

---

[4] The letter was prepared after previous conversation between Underwood and one of the bank officials.

*gagors to mortgagee;*[5] then this instrument to be null and void; otherwise to remain in full force and effect.'' We deem this insufficient since one of the mortgagors was Mary Virginia Jacobs,[6] who owed no other indebtedness to the bank, and did not subsequently execute any notes. While there is testimony that the bank intended the mortgage to cover future loans, it is noticeable that the mortgage provides that the mortgagors shall keep the property insured in the amount of $3,000. It would seem logical that if the mortgage were intended to cover other indebtedness, the clause would have read ''in the amount secured by this mortgage.'' Be that as it may, we consider the language insufficient to accomplish the result sought by the bank. In the case of *American Bank & Trust Co.* v. *First National Bank of Paris,* 184 Ark. 689, 43 S. W. 2d 248, this Court said:

''One may execute a valid mortgage to secure a debt to be contracted in the future (citing earlier cases) but, in order to do so, there must be an unequivocal agreement in the instrument itself that it is given for debts to be incurred in the future.   *   *   *''

In the same opinion, quoting from *Word* v. *Cole,* 122 Ark. 457, 183 S. W. 757, the Court further said:

'' 'The effect of our cases is that a mortgage to secure future advances   *   *   * is valid, but, if such purpose is intended to be accomplished, that fact must clearly appear from the instrument, and such purpose will not be presumed where the instrument does not contain a general description of the indebtedness secured so as to put one who examines it on notice that this was its purpose in order that such person may pursue the inquiry which such knowledge would suggest.' ''

Further:

''Where one contracts in good faith with a debtor that the security given should include not only that

---

[5] Emphasis supplied.

[6] Mr. and Mrs. Jacobs owned the property as tenants by the entirety.

specifically mentioned in the mortgage but other indebtedness, whether existing then or to be incurred in the future, it is not difficult to describe the nature and character thereof, so that both the debtor and third parties may be fully advised as to the extent of the mortgage. Sound policy demands no less. Especially is this true where the terms of the mortgage are sought to be extended by means of the language of the defeasance clause, which is usually at the end of the mortgage and, in the prepared forms commonly in use, is in small type which escapes all but the closest scrutiny.''

Numerous other cases denote the same holding. In the instant mortgage, there is nothing said about future advances; the instrument is only a form mortgage, and falls far short of meeting the requirements set forth in *American Bank & Trust Co., supra.*

We do not agree with appellants in their second contention. It is argued that when the bank took possession of the automobiles, it became a trustee of the vehicles, accordingly owed the highest fiduciary duty to Jacobs, and was bound to obtain the highest possible price for them. Appellants contend that the provisions of the chattel mortgages on the vehicles were not complied with, in that before a sale of the property was authorized, same should have been advertized by ''ten days notice in some newspaper published in Sebastian County, Arkansas, or by written notices posted at least five places near the property.'' This admittedly was not done. A number of witnesses testified that the automobiles were sold to Swink at a price considerably less than their value, and in fact, Swink later resold them at a figure approximately $2,000 higher than the amount he had paid for them. There was some evidence that other automobile dealers were notified by the bank of the proposed sale of the cars. We consider, however, all of such evidence to be irrelevant to the question involved, for the reason that the bank was not acting as trustee. The cars were taken over by the bank at the request of Jacobs, through Underwood. Though Jacobs originally desired that the bank send a man over to his

used car lot to handle the cars there, he apparently recognized that appellee likely would not be willing to do so. From the testimony of Underwood:

"Q. Did he give you authority to dispose of the cars and power to turn them over to the bank?

A. He said it would be up to the bank what they wanted to do about it.

Q. Did he tell you to turn them over to the bank if they asked for them?

A. Yeah.

Q. And the bank did ask for them and you turned them over?

A. Yeah."

As to whether a greater price could have been obtained for the vehicles, is mere conjecture. We agree with the trial court that the bank acted in good faith, and there was certainly no reason for appellee to dispose of the cars at a price less than could have been obtained. Jacobs himself ratified and confirmed the transaction, which is shown by defendant's exhibit 19, an analysis sheet listing the various cars, their average retail value, the amount for which each had been sold by Swink, and the total amount of loss resulting from the sales. This was prepared by Jacobs on March 27th, when most of the vehicles had been disposed of. Jacobs had written on the bottom of the sheet: "I owe $5,000 note less res. $1,697.95." Thus, Jacobs recognized his indebtedness under the note in question, and apparently had no thought that the bank had acted improperly, or beyond its authority, in disposing of the automobiles.

Nor can we agree with appellants' third contention. As already stated, we do not characterize the bank's action as "repossessing" the vehicles; rather, with the authority and consent of Jacobs, the bank undertook to help him out of a bad situation and minimize his losses. The reserve was applied against such losses, and this was with the authority of Jacobs, who, on February 23,

1956, wrote the bank to "Please release as much of my reserve as you can to apply on my indebtedness to the City National Bank." Jacobs contends that the judgment should have at least been reduced by $1,908.45, the balance remaining in the reserve account at the time of the trial. Appellee admits that after all contracts are liquidated, Jacobs will be entitled to credit on the bank's judgment for any amount of the reserve remaining.

We conclude that the court's action in dismissing the counterclaim was proper.

For the error in holding that the note of October 18, 1956, was secured by the real estate second mortgage of September 24, 1955, that portion of the decree is reversed, and the cause remanded with directions to enter a decree not inconsistent with this opinion.